# EXHIBIT "A"

# BROKER AGREEMENT

| | |
|---|---|
| Client Legal Name: | White House Foods, Inc. |
| Client Billing Address: | 701 Fairmont Ave |
| Phone: | 540-662-3401     Fax: |
| Client Contact: | Dave Durden    Email: ddurden@nfpc.com |

This **BROKER AGREEMENT** (including all Exhibits attached hereto, this "Agreement"), dated as of the latest date set forth on the signature page hereto (the "Effective Date"), is by and between Acosta, Inc., a Delaware corporation, whose address is 6600 Corporate Center Parkway, Jacksonville, Florida 32216 ("Acosta"), and the client identified above ("Client"). Acosta and the Client may individually be referred to as a "Party" and collectively as the "Parties." In consideration of the agreements, covenants, representations and warranties contained in this Agreement, Client and Acosta agree as follows:

## ARTICLE I: SERVICES; TERM

Section 1.1  Services. During the Term, and in accordance with the provisions contained in this Agreement, the Client hereby appoints Acosta, and Acosta hereby accepts such appointment, as the Client's exclusive representative to provide the services described on Schedule A attached hereto ("Services") to market the products described on Schedule B attached hereto ("Products") at the prices the Client delivers to Acosta in writing on the Effective Date ("Product Prices") to customers described on Schedule B attached hereto ("Customer(s)") in the channel(s) described on Schedule C attached hereto ("Channel(s)") in the territory described on Schedule C attached hereto ("Territory"). All Product Prices are subject to change by the Client upon sixty (60) days' prior written notice to Acosta.

Section 1.2  Term; Termination. This Agreement shall commence on the Effective Date and continue until terminated in accordance with the provisions of this Section 1.2 ("Term"). Either Party may terminate this Agreement at any time for any reason by giving the other Party at least thirty (30) days' prior written notice of such termination. Anything contained herein to the contrary notwithstanding, if the Client fails to pay any amounts due pursuant to the provisions contained in this Agreement, then Acosta will have the right, in addition to its other remedies and rights, to either (a) suspend performance of the Services, in whole or in part, until all outstanding amounts have been paid in full, or (b) immediately terminate this Agreement by delivering written notice thereof to the Client. Any provision of this Agreement which imposes an obligation after the termination of this Agreement shall survive the termination of this Agreement.

Section 1.3  Effect of Early Termination. On the termination of this Agreement for any reason: (a) the Client will promptly pay Acosta for any Services performed and reimburse Acosta for any costs and expenses incurred on or before the effective date of termination of this Agreement, (b) Acosta will immediately discontinue providing the Services, and (c) each Party will deliver to the other Party, or, at the disclosing Party's option, destroy, all of the disclosing Party's Confidential Information, documents, materials and personal property that are in the receiving Party's control or possession (in all forms and in all media), and all copies thereof, except that the receiving Party may retain one (1) copy of such Confidential Information, documents and materials for its records.

## ARTICLE II: FEES, EXPENSES AND PAYMENT

Section 2.1  Fees and Expenses. In accordance with the provisions of this Agreement, the Client shall pay Acosta the commission ("Commission") and fees ("Fees") described on Schedule B attached hereto (collectively, "Compensation"). During the Term, the Client agrees to reimburse Acosta for (a) pre-approved costs and expenses incurred in connection with Acosta's provision of the Services, and (b) all costs and expenses incurred by Acosta personnel in connection with Client-requested travel, lodging, meals and/or entertainment. The Parties agree that Acosta will not be entitled to any Commission on Products that are not accepted by any Customer or for any Products for which the Client issues a credit memorandum. The Client agrees that (a) Acosta is not responsible for any Customer's failure to pay and (b) it will not reduce Acosta's Compensation by any amount (i) if any Customer fails to deliver payment to the Client for the Products for any reason, and/or (ii) charged by a third party provider for mandate services. The Client agrees that all hourly rates and rates for full-time equivalents contained herein will increase on each anniversary of the Effective Date by an amount equal to the product of the (a) current hourly rate and (b) cost of living adjustment percentage as determined by the United States Social Security Administration for the subject year.

Section 2.2  Invoicing and Payment. The Client will pay Acosta (a) each Commission on or before the forty-fifth (45th) day following the end of the month the Products are shipped and (b) for each Fee invoice within forty-five (45) days of the Client's receipt.

Section 2.3  Product Order Review. The Client agrees to maintain accurate records that arise out of or relate to fulfilling the Product Orders, including shipping receipts and credit memorandums, and readily make such records available to Acosta upon its reasonable request. In the event Acosta's document review reveals an underpayment of compensation to Acosta ("Delinquent Compensation") in accordance with the provisions contained in this ARTICLE II, and the Client does not dispute the amount owed, the Client will promptly pay Acosta the Delinquent Compensation. If the Parties have not reached a resolution regarding any alleged Delinquent Compensation within thirty (30) days of the initial document request, any such dispute shall be escalated to the Parties' respective senior level managers or vice presidents who shall work in good faith to resolve such dispute.

## ARTICLE III: AGREEMENTS AND COVENANTS

Section 3.1  Product Orders. Acosta agrees to promptly deliver to the Client all purchase orders for the Products ("Product Orders") for acceptance by the Client. The Client will use its best efforts to accept and fill all Product Orders presented by Acosta. All Product Orders are subject to acceptance by the Client. Acosta may not accept any Product Orders on behalf of the Client or bind the Client in any way in connection with any Product sale transaction. The Client will be responsible for making all final determinations regarding a Customer's credit and the credit terms offered to a Customer.

Section 3.2  Service Policies. Acosta agrees to market the Products to the Customers in the Territories in accordance with the Client's reasonable policies and procedures (the "Client Policies") delivered to Acosta in writing from time to time during the Term. All Client Policies are subject to change by the Client upon sixty (60) days' prior written notice to Acosta.

Section 3.3  Client Agreements. The Client agrees to promptly ship the Products described in each accepted Product Order on the terms contained in each Product Order. The Client agrees to provide assistance, information and/or materials at its own expense as reasonably requested by Acosta to support its provision of the Services. During the Term, the Client agrees to (a) maintain insurance coverage in accordance with industry standards, including products liability coverage, (b) name Acosta as an additional insured on at least its products liability policy, and (c) deliver a certificate of insurance to Acosta on the Effective Date that complies with this Section 3.3.

Section 3.4  Confidential Information. During the Term, the Parties may become privy to non-public confidential or proprietary information of the other Party with respect to such other Party's business, products, research and development, services, contracts (including with third parties and this Agreement), and its customers, independent contractors, suppliers and other business relations, including information concerning such other Party's intellectual property rights, business and management methods and techniques, market information and analysis, financial reports and statements, instruction manuals, know-how, strategic plans, technology and trade secrets (collectively, "Confidential Information"). During the Term and thereafter, neither Party shall, and each Party shall cause its Affiliates, agents, employees, subcontractors and representatives not to, disclose, divulge, use or make available any of the Confidential Information of the other Party to any entity or person (a) without the other Party's prior written consent, or (b) in connection with any activity or business other than that of the other Party; provided, however, that this provision shall not apply to information that (i) is part of the public domain, (ii) is disclosed for the purpose of performing obligations described herein, (iii) was demonstrably in the possession of the receiving Party prior to its disclosure, (iv) is hereafter acquired by the receiving Party through a third party under no obligation of confidence, (v) is independently developed by the receiving Party without the benefit or use of the other Party's information as evidenced by such receiving Party's written records, or (vi) which is required to be disclosed by law or court order.

Section 3.5  Non-Solicitation. During the Term and continuing for six (6) months after the termination of this Agreement, neither Party will actively solicit any employee of the other Party who has performed any material work for the hiring Party under this Agreement, and with whom the hiring Party has had direct contact under this Agreement, without the other Party's prior written consent. Notwithstanding the foregoing, neither Party shall be precluded from conducting general recruiting activities, such as participation in job fairs or publishing advertisements in publications or on websites for general circulation.

## ARTICLE IV: INDEMNIFICATION; INSURANCE; LIABILITY

Section 4.1   Indemnification by Acosta. Acosta agrees to defend, hold harmless and indemnify the Client and its Affiliates, agents, employees, directors, officers and representatives (each, a "Client Indemnitee") from and against any and all claims, demands, liabilities, losses, damages, injuries (including death), actions, causes of action, suits, proceedings, judgments and expenses, including reasonable attorneys' fees and court costs, including, but not limited to, those costs incurred at the trial and appellate levels and in any bankruptcy, reorganization, insolvency or similar proceeding, and other legal expenses, asserted by any third party (collectively, "Claims") arising out of or related to Acosta's gross negligence; provided, however, that this Section 4.1 will not apply to the extent that any Claim is caused by the gross negligence of a Client Indemnitee.

Section 4.2   Indemnification by Client. The Client agrees to defend, hold harmless and indemnify Acosta and its Affiliates, agents, employees, directors, officers and representatives (each, an "Acosta Indemnitee") from and against any and all Claims arising out of or related to (a) the Client's gross negligence; provided, however, that this Section 4.2(a) will not apply solely to the extent that any Claim is caused by the gross negligence of an Acosta Indemnitee, and (b) the delivery, discontinuance, distribution, manufacture, sale, use of, labeling or any casualty to the Products, including product liability claims.

Section 4.3   Indemnification Procedures. Within ten (10) business days after receipt of any Claim notice, the indemnifying Party shall undertake the defense of each such Claim. If the indemnifying Party fails to undertake and sustain the defense of any Claim in the manner required by this Agreement, the indemnified Party may engage separate counsel to defend such Claim; provided, however, such Party cannot pay, settle, or otherwise finally resolve such Claim without obtaining the prior written consent of the indemnifying Party. If the indemnifying Party undertakes the defense of a Claim in the manner required by this Section 4.3, the indemnified Party may, at its own expense, engage separate counsel and participate in the defense of any Claim brought against it. The indemnified Party agrees to cooperate with the indemnifying Party in the investigation and defense of the Claim.

Section 4.4   Limitation of Liability. EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS UNDER SECTION 4.1 AND SECTION 4.2, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INCIDENTAL, INDIRECT, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES FOR ANY CLAIM ARISING OUT OF THIS AGREEMENT, REGARDLESS OF THE CAUSE OF ACTION AND EVEN IF SUCH OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. ANYTHING IN THIS AGREEMENT TO THE CONTRARY NOTWITHSTANDING, ACOSTA'S LIABILITY FOR LOSSES ARISING OUT OF OR RELATED TO THIS AGREEMENT AND/OR THE SERVICES, WHETHER IN CONTRACT OR TORT (INCLUDING ACOSTA'S OWN NEGLIGENCE), LAW OR EQUITY, WILL BE LIMITED TO THE LESSER OF THE ACTUAL DIRECT DAMAGES INCURRED BY THE CLIENT OR THE TOTAL FEES PAID TO ACOSTA DURING THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE DATE ON WHICH THE FACTS OR CIRCUMSTANCES THAT GAVE RISE TO THE CAUSE OF ACTION FIRST OCCURRED OR WERE IN EXISTENCE.

Section 4.5   Disclaimer. ACOSTA DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE SERVICES; SPECIFICALLY, ACOSTA DISCLAIMS ANY WARRANTY (A) REGARDING THE AMOUNT OF PRODUCT SALES THAT MAY BE GENERATED FROM THE SERVICES DURING THE TERM OR (B) REGARDING ANY ECONOMIC OR OTHER BENEFIT THAT CLIENT MAY OBTAIN BY ENGAGING ACOSTA TO PROVIDE THE SERVICES.

## ARTICLE V: REPRESENTATIONS AND WARRANTIES

Section 5.1   Representations and Warranties. Each Party represents and warrants to the other Party that (a) it has the full power and authority to enter into this Agreement, (b) the execution, delivery and performance of this Agreement has been duly authorized and constitutes a valid and binding agreement of such Party, (c) the execution, delivery and performance of this Agreement shall not result in the breach of, or constitute a default under, or violate any provision of, any agreement or other instrument to which such Party is a party, and (d) it will provide its obligations described herein in accordance with all applicable laws, rules and regulations.

## ARTICLE VI: MISCELLANEOUS

Section 6.1   Affiliate. "Affiliate" means any entity or individual that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the specified entity or individual. As used in this definition of Affiliate, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity or individual, whether through ownership of voting securities, by contract or otherwise.

Section 6.2   Notices. All demands, documents, notices, payments, reports, requests, returns or other communications ("Notices") delivered pursuant to the conditions, provisions and terms contained in this Agreement and other applicable law will be in writing and will be deemed to be sufficient if (a) delivered personally, (b) mailed by registered or certified mail, return receipt requested, postage prepaid, (c) sent by facsimile or other electronic transmission device, or (d) sent by a nationally-recognized, overnight courier, to the Parties at their respective addresses contained in this Agreement. All such Notices will be deemed to have been delivered and received (a) in the case of personal delivery, on the date of such delivery, (b) in the case of delivery by certified or registered mail, on the third (3rd) business day following such mailing, (c) in the case of delivery by facsimile or other electronic transmission device, on the date of such delivery if delivered on a business day, or if not delivered on a business day, then on the next business day after the day delivered and (d) in the case of delivery by a nationally-recognized, overnight courier guaranteeing next business day delivery, on the business day following dispatch.

Section 6.3   Independent Contractor. Acosta's engagement and provision of the Services shall be as an independent contractor to the Client, and neither Acosta nor any of its Affiliates, agents, employees, directors, subcontractors or representatives shall be an employee, joint venturer or partner of the Client for any reason. As an independent contractor to the Client, Acosta shall be solely responsible for all federal, local, provincial and state employment (including self-employment), income, social security and other similar levies and taxes payable by Acosta on or with respect to its receipt of the Fees.

Section 6.4   Assignment; Further Assurances; No Presumption Against Drafter. This Agreement may not be assigned by either Party without the prior written consent of the other Party. Each of the Parties shall execute any other documents and take any other actions as may be reasonably necessary to carry out the intent and purpose of this Agreement. The Parties agree that, despite any legal presumption or common law doctrine to the contrary, this Agreement shall not be construed against the drafter as both Parties have had the opportunity to review and accept the provisions contained in this Agreement

Section 6.5   Force Majeure. No Party will be held in breach of any provision of this Agreement if such breach arises out of or results from causes beyond the reasonable control of the Party required to take such action, including actions of or interference by governmental or other regulatory authorities, acts of God (including flood, fire or acts of nature), acts of terrorism, labor disturbance, wars, riots or other civil disturbances.

Section 6.6   Waivers; Severability. No failure or delay by any Party in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. In the event that any part of this Agreement shall be declared unenforceable or invalid, the remaining parts shall continue to be valid and enforceable.

Section 6.7   Governing Law and Venue; Waiver of Jury Trial. The execution, validity, interpretation and performance of this Agreement shall be governed by Florida law. Each of the Parties irrevocably and unconditionally submits, for itself and its assets, to the exclusive jurisdiction and venue of any Florida state court or United States federal court sitting in or having jurisdiction over Jacksonville, Florida and any appellate court from any such Florida state court or federal court, in any proceeding arising out of or related to this Agreement. THE PARTIES HEREBY INTENTIONALLY, KNOWINGLY AND VOLUNTARILY WAIVE ALL OF THEIR RESPECTIVE RIGHTS TO A TRIAL BY JURY IN ANY PROCEEDING BROUGHT TO ENFORCE OR DEFEND ANY PROVISION CONTAINED IN THIS AGREEMENT.

Section 6.8   Counterparts; Entire Agreement. This Agreement may be executed by facsimile, e-signature, or pdf/email and/or in counterparts and any such execution shall be a valid and binding execution hereof. This Agreement (including the Exhibits attached hereto) embodies the entire agreement and understanding of the Parties hereto, and supersedes all prior or contemporaneous written or oral communications or agreements between Acosta and Client, regarding the subject matter hereof. This Agreement may only be amended by written agreement between Acosta and Client.

IN WITNESS WHEREOF, the Parties executed this Agreement as of February 1, 2016.

ACOSTA: Acosta, Inc.

Signature: *Jeff Brophy*

Name and Title: Jeff Brophy, EVP, Corporate Transaction Services

CLIENT: White House Foods, Inc.

Signature: *Dave Durden*

Name and Title: Dave Durden     SVP, Sales

SCHEDULE A

Services

During the Term, Acosta will provide to the Client the following Services in accordance with each Annual Merchandising and Sales Plan (as defined below):  (a) headquarter services (collectively, "Headquarter Services"), (b) headquarter assist services (collectively, "HQ Assist Services"), (c) business insights services (collectively, "Business Insights Services"), (d) space technology services (collectively, "Space Technology Services"), (e) business process services (collectively, "Business Process Services"), (f) retail services during the syndicated retail continuity coverage store calls scheduled by Acosta (collectively, "Retail Services") and/or (g) mandate and reset services ("Mandate Services"):

a. Headquarter Services.

i. Promote the sale of all Products to Customers in the Territory at the prices that the Client delivered to Acosta in writing on the Effective Date (the "Product Prices"), and solicit orders from such Customers;

ii. Promote the sale of new Products to Customers in the Territory and develop presentations for such new Products;

iii. Serve as a liaison between the Client and the Customers to facilitate communication between the parties;

iv. Serve as the primary interface between the Client and the Customers;

v. Coordinate top-to-top meetings between the Client and Acosta;

vi. Collaborate with the Client's sales management team to develop a mutually acceptable business plan for the promotion of Product sales;

vii. Collaborate with the Client to develop a mutually acceptable business plan for the execution and measurement of in-store merchandising, assortment, pricing and shelving services (i.e. M.A.P.S.), specifically (1) selling promotional displays, extenders, and related item placements for the Products, (2) verifying that authorized Products are on shelves, (3) placing new Products, (4) verifying that in-store Product placements comply with Customer-approved schematics, and (5) taking corrective action on any distribution voids, out of stocks, missing tags, planograms not set to Customer-approved standards and authorized features and displays;

viii. Management of the Client's proprietary trade system and implementation of procedures for Acosta employees to abide by the Client's policies regarding the use of its proprietary trade system;

ix. Manage contracts for the Client's trade fund spending;

x. Administration of Customer deductions for trade promotions and issuance of repays to Customers as necessary; and

xi. Creation of a trade fund spending plan in alignment with the Client's investment guidelines and reconciliation of promotions against such trade fund spending plan.

b. HQ Assist Services.

i. Serve as the primary interface between the Client and the Customers;

ii. Coordinate top-to-top meetings between the Client and Acosta; and

iii. Collaborate with the Client's sales management team to develop a mutually agreeable business plan for the sale of the Products;

c. Business Insights Services.

i. Provide analysis of (1) data sources provided by the Client, (2) national and retailer-specific loyalty data, (3) shelf conditions and Product assortment, (4) price gaps, (5) market opportunities, (6) Product promotions, (7) Customer point of

sale data, and (8) shopper data; provided; however, the Client acknowledges that insights resources offered by Acosta are limited to data that is available to Acosta from the Client's database or accessible point of sale data;

  ii. Provide the Client with monthly analytic reporting regarding the data described in Section b.i.(1) above in accordance with mutually agreed upon templates;

  iii. Provide business reviews regarding the Client, the Products and/or the Customers; and

  iv. Provide category analysis for the Products and recommendations.

 d. Space Technology Services.

  i. Develop planogram recommendations for new Products and/or provide planogram reviews;

  ii. Develop planograms for the Products; and

  iii. Maintain an image library for the Products if an image library is not provided by the Client.

 e. Business Process Services*.

  i. Receive and cleanse Customer orders and/or order confirmations;

  ii. Validate trade claims in accordance with the Client's trade management policies and Acosta's trade management policies;

  iii. Auto validate tolerance deductions and check requests that are equal to or less than $250;

  iv. Implement a daily closed claim file feed for the Client;

  v. Upload/integrate Customer trade claims from daily Client aged trial balance;

  vi. Provide backup storage for Customer trade promotion contracts and deductions in accordance with Acosta's retention policies; and

  vii. Submit Customer repays in accordance with the Client's trade management policies and Acosta's trade management policies.

  *The Client agrees that the Business Process Services provided by Acosta in connection with this Agreement are solely applicable to the promotional contracts presented by Acosta to Customers. In the event Client desires incremental services from Acosta to provide Business Process Services for Customer promotional contracts created by another broker, the Parties are to negotiate in good faith on a mutually acceptable scope of services and consideration for such incremental services.

 f. Retail Services.

  i. Provide in-store merchandising, assortment, pricing and shelving services (i.e. M.A.P.S.), specifically (1) selling promotional displays, extenders, and related item placements for the Products, (2) verifying that authorized Products are on shelves, (3) placing new Products, (4) verifying that in-store Product placements comply with Customer-approved schematics, and (5) taking corrective action on any distribution voids, out of stocks, missing tags, planograms not set to Customer approved standard and authorized feature and displays:

  ii. Provide services, as requested by the Client, to install and maintain point of sale materials for the Products and instant redeemable coupons for the Products;

  iii. Activate the Client's merchandising initiatives for the Products for Customers in the Territory;

  iv. Use handheld devices for communicating selling objectives for the Products, providing sell sheets and for tracking and reporting (including with photos) on the performance of Retail Services;

  v. Review and communicate in-store competitive pricing and merchandising activity as requested by the Client;

DocuSign Envelope ID: FB124FDC-E156-4052-A58C-71E5E1073173

  vi.  Maintaining the Client's equipment, racks and stands for the Products for the Customers in the Territory;

  vii.  Use commercially reasonable efforts to remove damaged, spoiled and/or out-of-date Products from Customer shelves in the Territory specifically designated for the Products; and

  viii.  Present Product surveys and suggested Product orders to Customer store and department managers in the Territory.

  g.  <u>Mandate Services</u>. Provide Mandate Services as requested by Customers; provided, however, the Client agrees that Acosta will not be obligated to perform Mandate Services for any Customer that prohibits Acosta from providing such services after the Effective Date.

  The Parties agree that they will meet at least once per calendar year during the Term to develop a mutually acceptable annual merchandising and sales plan for the Products (each, an "<u>Annual Merchandising and Sales Plan</u>"). Each Annual Merchandising and Sales Plan may be amended upon the mutual agreement of the Parties. Each Annual Merchandising and Sales Plan will prioritize the Services to be provided by Acosta hereunder on a monthly basis and the Client acknowledges that Acosta's completion of each task described above during each store call is dependent upon the Client's prioritization of the Services.

DocuSign Envelope ID: FB124FDC-E156-4052-A58C-71E5E1073173

## SCHEDULE B

### Products, Compensation and Customers

1. <u>Products</u>. White House Brand:

   a. Apple Juice & Apple Cider (32oz, 46oz, 64oz, 128oz),
   b. Applesauce (15oz, 24oz, 25oz, 46oz, 48oz, 50oz, #10, Pouches),
   c. White Distilled, Apple Cider, Organic, Cleaning & Canning Vinegars (16oz, 32oz, 64oz, 128oz), and
   d. Specialty (14oz, 15oz, 20oz, 28oz), including sliced apples, escalloped apples, ice cream toppers, apple butter and spiced apple rings.

2. <u>Commissions</u>. During the Term, the Client agrees that it will pay Acosta at the respective Commission rates described below calculated on Net Sales for Products the Client sells to the respective Customers below:

| Customers: | Service Scope: | Commission Rate: |
|---|---|---|
| Walmart (excluding Sam's) | Retail Services (provided by the Flex Team only at an equivalent rate of $24/hr) | 1.1% |
| Publix | Headquarter Services, Business Insights Services, Space Technology Services, Business Process Services, Retail Services and Mandate Services | 3.5% |
| Delhaize | HQ Assist Services, Retail Services and Mandate Services | 3.2% |
| MDI | Headquarter Services, Business Insights Services, Space Technology Services, Business Process Services, Retail Services and Mandate Services | 3.5% |
| Harris Teeter | Headquarter Services, Business Insights Services, Space Technology Services, Business Process Services and Retail Services | 3.1% |
| Ingles Markets, Inc. | Headquarter Services, Business Insights Services, Space Technology Services and Business Process Services | 1.5% |
| C&S (Ahold) | Headquarter Services, Business Insights Services, Space Technology Services, Business Process Services, Retail Services and Mandate Services | 3.5% |
| C&S (Southeastern Grocers) | Headquarter Services, Business Insights Services, Space Technology Services, Business Process Services, Retail Services and Mandate Services | 3.5% |
| Supervalu | Headquarter Services, Business Insights Services, Space Technology Services, Business Process Services, Retail Services and Mandate Services | 3.5% |
| Mid-Mountain Foods, Inc. | Headquarter Services, Business Insights Services, Space Technology Services and Business Process Services | 1.5% |
| Kroger Company | Headquarter Services, Business Insights Services, Space Technology Services, Business Process Services and Retail Services | 3.1% |
| W. Lee Flowers & Co. | Headquarter Services, Business Insights Services, Space Technology Services and Business Process Services | 1.5% |
| Nash Finch | Headquarter Services, Business Insights Services, Space Technology Services and Business Process Services | 1.5% |
| Piggly Wiggly (Alabama) | Headquarter Services, Business Insights Services, Space Technology Services and Business Process Services | 1.5% |
| Marc Glassman, Inc. | Headquarter Services, Business Insights Services, Space Technology Services and Business Process Services | 1.5% |

"Net Sales" means the gross Product Prices generated by Products shipped to the Customers in any subject calendar month during the Term minus quantity discounts, cash discounts and promotional allowances. The Client agrees that slotting and product placement fees will not be deducted in the calculation of Net Sales.

      3.      Bonus. In addition to the Commission rates payable to Acosta described in Section 2 above, the Client agrees to pay Acosta an incremental 1.5% of Net Sales for a period of two (2) years for all new Products sold in at the following Customers: Stop & Shop, Giant Eagle, Wegmans, Wakefern, Kroger, Top's Markets, HEB, and Meijer. The Client agrees to pay such bonus on or before October 31st each calendar year during the Term.

      4.      Mandate. During the Term, the Parties agree that the Commission rate payable to Acosta described in Section 2 above will be automatically reduced by 0.40% for any Customer receiving Headquarter Services, Business Insights Services, Space Technology Services, Business Process Services, Retail Services and Mandate Services on the date such Customer begins using a single source provider for mandate services. For example, the Commission rate payable for HEB would be reduced from 3.5% to 3.1% on the date HEB began using a single source provider for mandate services.

DocuSign Envelope ID: FB124FDC-E156-4052-A58C-71E5E1073173

## SCHEDULE C

### Channels and Territory

1. <u>Channels</u>.  Walmart (excluding Sam's) and Grocery.

2. <u>Territory</u>.  United States.